Good morning, Your Honors. We're here today to correct a conviction that should have never legally or factually happened. Mr. Selgas was convicted of two criminal offenses, the income tax evasion of the payment of taxes, and also the conspiracy under Section 371. I will primarily be addressing the evasion of the payment of taxes in today's argument, because the 371 conspiracy lies in the clause based on what happens with the evasion of the payment of taxes. Mr. Selgas was convicted of evasion of the payment of taxes for the years 1998-2002 and for the year 2005, even though the taxes from 1998-2002 were fully paid and the deposit was paid by Mr. Selgas for the year 2005. The taxes for the years 1998-2002 were paid by the tip-debt withholder, and the taxes for the year 2005 were paid by Mr. Selgas and his deposit of $14,850 when he filed his return. And that was paid for by a deposit made by a check that accompanies your return, and it was reported that it was on his return. And because the prosecution was unable to prove a, quote, tax deficiency in this case, the charges against Mr. Selgas should be remanded. The reason for this is because had the tax deficiency been presented to the jury, they would have discovered that the payment of taxes from 1998-2002 was actually paid. He made a deposit in 2005, and the IRS failed to show, follow internal evidence of the attorney for the tax deficiency well. Had they had that information, it would have been a different verdict by the jury. I want to point out that the indictment was very, very specific. Thomas Selgas was charged in account two with evasion of the payment of taxes. Account two, he specifically was charged with payment of taxes, failure to pay taxes evasion, for the year 1998 and for the year 2005. So there were two periods of time that were involved in this. And because of this two periods of time, we have to look at two different periods of what happened. Taxes from 1998-2002 were fully paid. I'm going to address that in two minutes, but I want to start with 2005. Taxes for 2005 were not due on home because the IRS did not follow the tax deficiency procedures. But this whole trial, this whole trial went forward on the basis of an evasion of payment theory. An evasion of payment theory. It's about a trial, and it's all about evasion. I'm going to get into an argument. It's that the trial was conducted on the theory of fraud. I'm going to give up. The difficulty is that you argued that there should be more constructively specific on account two constructively amended indictment, correct? I'm not sure I understand what your question was. I'm a little hard of hearing, and you're not coming through as clear as I would like. Can you say that a little bit louder? Well, I understand your argument, but you're asking about the difference in the language between the jury charge and the indictment. Well, that is one of the jury instructions, yes. And I think what you're talking about is that one of the jury instructions did, in fact, give a choice between evasion of payment and the failing of the file. Is that what you're talking about? Well, in any event, the taxes were 2005. We're not going to go into why internal revenue goes, because if any internal revenue goes, tax proficiency does not happen until there is a tax return filed and a deposit paid, and the IRS goes through the procedure of evasion of payment. Once that tax proficiency is determined, a notice of deficiency is sent out, and it goes to the tax court, or the person who does the payment goes to the tax court. They send out a notice of demand, and the tax does not do a knowing or a law until that notice of demand is sent out. Mr. Sellers did pay his 2005, what he calculated as his tax, and reported it. And I just want to make that clear. Anyhow, what's happened here is throughout the course of the legal action on Section 721, almost all courts treat these two crimes as one crime. But the Sansone case made it clear there were two crimes. One is evasion of the assessment, and one is evasion of the payment of taxes. And that's been recently decided in 2012. And the elements of the crime are unworthiness, tax proficiency, and an affirmative act. But Mr. Sellers was only charged with evasion of the payment of taxes, not the assessment. And the Fifth Circuit has never addressed that particular issue where somebody filed a claim, made a deposit. So they've never addressed that particular issue. So this is the case of the first impression. So the question is, what is a legal definition of tax proficiency, which is what the courts are supposed to call it? Tax proficiency is when somebody files a tax return and reports what they made and paid it. And the IRS makes a determination based on that return that additional taxes are owed. That is a tax proficiency. But it doesn't ever become, yes. That just sounds like a legal argument to me about what the definition of it is, what the definition is for tax proficiency. And I guess I may have misunderstood your claim because I thought your claim won on a constructive amendment. You're claiming that there was an amendment constructively to an indictment because of the use of the language evasion of assessment and then evasion of payment. No, that wasn't the constructive amendment I was talking about. The constructive amendment I was talking about was where the judge made an instruction that the jury would find him guilty of a felony or of a failure to pay. And my argument was addressed at what the definition of tax proficiency was. And so who misinterpreted or misread the definition of tax proficiency? Where did that error occur? I would say the court misinterpreted what the tax proficiency was way back in the day. The district court did? No, the Sansone court, the Supreme Court. Sansone used tax proficiency. And in the Sansone case, there was no tax proficiency. There are three ways that we can have tax due and owing. One way is no tax return filed. Tax is due and going on April 15th. The second way is when the person files a tax return and reports that it doesn't pay. That is also a tax due and owing. It's not a tax proficiency. The third way is what I've already explained. It's when they determine that it's a tax proficiency and they go through the tax court process. And after the notice of demand comes in, the law says that I think it's 162.15 and 162.13. The law says that it's a tax not due until that notice of demand is sent. So there is a difference between a tax proficiency and a tax due and owing. In the Sansone case, this is tax proficiency. When it should be the same, tax due and owing. It's in that case. And that's what I'm looking at here is the element of a tax proficiency only comes up when a person files a tax return and pays something. And then the IRS determines there is a tax proficiency. That's the only place you can go where a tax proficiency comes up. Let me ask you a question about this. From 2007 to 2017, over a 10-year period, your client deposited more than $857,000 into bringing the lawyer a trust account. The IRS did. The lawyer didn't maintain the trust. It was such a trust fund. And they would have paid all our expenses over a period of 10 years, I would have. When they didn't, they blamed the money came out of that account. Can you give me an explanation for why that's the reason? Yes, I can. The reason for that is... Tell her that in the audience. Okay. First of all, on the IOTA situation, there's three reasons for why the IOTA account is there. First of all, the IRS never notified Mr. Sellers of the 1998-2002 tax return to sue. They were paid by the tax return. It was filed. The IRS credited with him in two years... Well, immediately when he filed in 2006. Two years later, they reversed it and never sent him a notice about it. The second thing is, there was no notice ever sent to him about 2005. So, the question about the IOTA is really kind of going on track here, because the IOTA... The IRS is saying he's trying to hide it from the IRS. He didn't know he owed anything. He didn't have any notice the other day. And what he did with the IOTA is basically the interior. The second part is that his tax efficiency was not sent out on 2005. And the third issue is that Mr. Sellers testified earlier that Mr. Sellers had had problems earlier with banks, and he didn't trust banks. And he discovered that in Texas, when an IOTA is used, the client is the one that owns the IOTA. But the Supreme Court in Shaw v. United States, I believe it was the 2016 case, made it clear that when the bank... When a person makes a deposit in the bank, the bank owns it. And it's kind of like an equity ownership of it, because they can loan his money out, so they can loan him. And he didn't trust the banks, so he put it in the IOTA. And that's the primary reason he did that. That didn't come out of the client, except through Mr. Sellers' testimony. So I put the money in an IOTA so the bank couldn't loan it out to somebody? Is that what you're saying? Basically, yeah. Because he wanted to own his own property, and he'd already lost some money years ago from the bank. He borrowed some money from someplace, and the bank came in and closed down his account, and he lost the money on him. That was one of the reasons why he did it. That never came up in the trial. And through his attorney, he found out that he put the money in the IOTA, basically the bank, on the... And it says it's unregistered. Can I transfer the residence in Athens, Texas, to the Sonoma Local Trust? Excuse me. I'm going to say something. I hope you understand. That characterization is a bald-faced lie. That, not to you, but was said by the IRS. The trust was set up by the father-in-law, who paid the money into the trust. It was his own money. He paid the trust. The effect of that assessment was to prevent the government from discovering the title. In fact, it didn't succeed in doing that. No, no, it didn't. What happened was the IRS... First of all, the IRS did not have any legal reason to collect it, because they hadn't sent out any notice or anything. But the trust was paying for it in gold coins, which would put them to over $300,000. It was paying for it. Well, that's not my question. The question is not directed to the government. I don't know what your goal here is. Except, it isn't directed to the opposition. And I'm sure the government argued with the jury that you're paying income taxes to put it directly. And you have your residence. You put all your money. But the lawyer and the housing council, they don't know where it is. And you have a residence. You go over to my property in Athens, Texas, and then put it there and say the title. Well, then you put that in front of the trust to get that out. I'm just saying to you that why would a jury reasonably conclude that this is — if you put the picture together, this is what they're going to put in front of the trust. Excuse me. The reason why the jury couldn't figure that out is because the government misrepresented that trust. That trust was not a nominal transfer. That trust, the father-in-law paid that $400,000. The purpose of the trust was to prevent someone from looking at the same title, looking for paid workers, land properties, or something taxable. That wasn't the intent of the trust. The government didn't locate that property. No. The reason the trust said that is because Mr. Stolz said — I'm just saying, though, whether a jury is reasonably able to conclude from that — Well, they can conclude. They can conclude what you just said because that's what was misrepresented to them. The trust was not a nominal transfer. It was purchased outright. And it was purchased for the reason that Mr. Stolz was going through cancer treatment and needed money, so his father bought the trust for that. Did he buy it when Mr. Stolz didn't have the jury? No, he didn't. We didn't have — I got involved in the case just before the trial started. I didn't know all of this. And the other thing is — So, I say my time is up. Good morning. Good morning. Judge LaFleur. However, that did not alter the elements of the tax evasion offense. It also did not change the government's prosecution and theory of the case. And it didn't change the outcome of the trial. As a result, a reasonable jury, properly instructed, would have convicted him for affirmative acts committed after July 18, 2012. And specifically, as you yourself noted, Judge Paganbaum, the dozens and dozens of transfers in and out of Mr. Greene's Iowa case. On page 11 and 12 of the government's brief, there are two charts that show the yearly — and I'm fairly sure that you've seen that because you pulled the number from there. I can also point out that after the statute date, about 313 went in and 389 came out. So, his use of Greene's iota is so incriminatory that he doesn't even discuss it in his briefs. Now, he also makes another claim of reversible claim error in the jury instructions, and that, I believe, Mr. McFarland has addressed more directly. And that is a passing reference to assessment in the actual evasion of payment during the instruction. Now, this court, it was sought, and Nolan made it clear, tax evasion is a single offense that can be committed two different ways, by evading assessment or by evading payment. But once again, that passing reference in the jury instruction for tax evasion did not change the elements of the offense, it didn't change the government's case, and it didn't change the outcome of the case. There were numerous affirmative acts following — sorry, the statute of limitations date, and not just the dozens and dozens of transfers in and out of Mr. Greene's iota accounts. There were also the gold-funded IRA that Mr. Selvis realized the government had found, the revenue officer, Daniel, had found a retirement account at Equity Trust. And when Mr. Selvis found out that the government was aware of that and that the government could levy it, he removed it. And he removed it prematurely, which everyone knows has severe tax consequences. But let me be clear. Mr. Selvis has not paid his taxes. He simply has not paid his taxes. He hasn't paid his full taxes since 1998. Ninety-seven was paid by the $14,000-something check that he sent in for his 2005 taxes, which should have been at least ten times higher. Mr. Selvis hasn't paid his taxes. And not only has he not paid his taxes, he has made every effort possible to hide it from the government, to hide it from the IRS. And he has played this game with the IRS in different iterations for well over a decade. A decade was what he was putting his money in Greene's iota. The court properly instructed the jury on the elements of tax evasion, including the necessity for affirmative act evasion, and that Selvis was not on trial for any act, conduct, or offense not alleged in the indictment. The government did not allege failure to file at any point. Failure to file wasn't alleged as part of the evasion payment case. It was not alleged even as part of a conspiracy. In fact, the only... Let me ask you a question. What was the total taxable income for which taxes were not paid? Oh, goodness. From, I think, 2002 was primarily paid because there were withholdings that year. From 98 to 2001 was probably a couple hundred thousand income. But the big haul was the Lionel distribution in 19... sorry, 2005. And that was approximately $1.3 million of income that Mr. Selvis did not report on a tax return. Now, he's going to claim that he did make a tax return, but he actually just filed a false statement with the government, with the IRS, substantially undervaluing that distribution. And that statement wasn't a return, was it? No, it was not a return. I mean, the... Sorry. He claims it was what's called a Beard Return, which is basically something designed to determine whether the statute of limitations applies when you're attempting to determine whether the return was filed on time. The Beard Return is simply a way of allowing someone to file their return if they don't have access to the proper forms. His statement was not a return. It was not even a Beard Return. In fact, the statement shown at trial, the 2005 statement, wasn't even signed, much less signed under penalty of perjury. Had it been signed, and I do believe that there must be a version somewhere, this is the version the government got from Selvis, it must have been signed at one point because we know that the government deposited the check. But even had he signed the document that was entered into evidence, it was not signed under penalty of perjury. Those words did not appear. And it was not, in fact, Your Honor, a good faith effort to report his taxes to the IRS. I can address the other issues as well if Your Honor would like. If you have no further questions then, I will be happy to give my time back to you. The government asks that you confirm Mr. Selvis' conviction. Thank you. Yes, Your Honor. I would like to address very, very quickly. On the trust, Mr. Selvis was given a life estate. And the trust was gearing for the father-in-law's grandchildren. They would take over after his life estate. It wasn't a purpose of hiring him. It was to pay his medical expenses. Second of all, I want to address the Beard Return. You're probably asking why the Beard Return. Well, the Beard Return is authorized in the Fifth Circuit. And it is the law of Beard v. Commissioner. And there are certain requirements that have to be there. When Mr. Selvis filed his 2005 statement, he listed the requirements of the Beard Commissioner case in there, put them all in there. And he did sign them under perjury. The problem is, is when the IRS received that, they didn't process it. Their Internal Revenue Management said they're supposed to process Beard Returns. They didn't process it, even though it was filed. They sent it to Auburn. And they had a copy that Mr. Selvis had that wasn't signed. It was his copy. But the original signature is someplace in Auburn. And it's in the possession of the IRS. And it was signed under penalty of perjury. And he listed all the requirements of the Beard Return. And his purpose of filing that Beard Return was not to evade tax. He was challenging something that had nothing to do with tax. He was challenging the Secretary of Treasurer's requirements under Title 31, Section 501.9 that he was supposed to keep the Federal Reserve notes and the gold concurrency in equal purchasing power. And he was trying to challenge that. And he actually paid. He took $1,850, or $485, gold coins. He actually tried to pay the IRS that. The IRS rejected it seven times. That was in the transcript testified by John Green, who accompanied him with that. Then, when he calculated his taxes, he based it on the gold standard. And he came up with the $14,480. And he took that money to the bank and paid them that gold. And they only gave him a check of $14,850. But when you look at the last two pages of his return, he points out that he paid the bank in the same amount of gold that he started off with. He paid $1,000,000 or $600,000 in taxes, trying to pay to start off with. And then when he went to the bank, he told the bank, this is $1,485, and that's on his statement. That's what he did. The bank took it, and only gave him a $14,000 check. Then he sent that to the IRS and told them to redeem him according to Chapter 12, Section 411, which the IRS didn't do. Instead, they wanted to charge him with failing to pay. So contrary to what the counsels say, he did pay his taxes. But the problem is, the IRS never got it because of the corpus law, which is basically a situation where you've got, even today, in today's society, people are concerned about inflation. He was addressing that way back when, back in 2005. You take $10 of gold and went to the bank, and they'll only give you a $10 bill, even on $1,400 a day. And there's something wrong with that kind of a situation. And for somebody to be trying to change, point out the inequity in the law, to charge him with evasion of taxes, when he tried 750 times to pay $10 gold coins, the IRS is ridiculous. The same thing happens in 2000, from 1998 to 2002. He went to the tax board. And this is the one thing that really is, you should understand. The IRS said he was not allowed withholding because of the tax board. There's not a single tax board in existence that says Tom Sellers was not allowed withholding. That was his wife. They called him a non-parent, non-tax petitioner. I never heard that term before. It's a new term. She was there individually, and they said she couldn't take the withholding. But when he went to court on his own, they said he could. So they're telling the jury he wasn't allowed withholding. That's why he didn't pay his taxes. So, again, unless you have any questions, I'm done.